UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

       - against –                                     18 CR 509 (GBD)

KARLIS VITOLS, et al.,

                      Defendant.

------------------------------------------------------------X

**SENTENCING MEMORANDUM OF DEFENDANT KARLIS VITOLS**

      Defendant Karlis Vitols, ("Mr. Vitols" or "Karlis") through his undersigned counsel, respectfully submits this Sentencing Memorandum for the Court's consideration in connection with his sentencing scheduled for January 9, 2020. In light of all of the factors enumerated in 18 U.S.C. § 3553(a), discussed in more detail below, defense counsel respectfully requests that the Court impose a below-Guidelines sentence of 18 months and period of supervised release deemed appropriate for a defendant subject to deportation after his sentencing. The sentence sought on behalf of Mr. Vitols addresses the Court's mandate to impose a sentence which is "sufficient, but not greater than necessary" to meet the goals of the Sentencing Reform Act.

      Like many recent immigrants from Eastern Europe, Mr. Vitols came to the United States with very little actual knowledge about the country but lots of myths about the wealth of its inhabitants and the ease with which one could make money with a little bit of hustle and street smarts. It is true that Mr. Vitols came to the United States and immediately engaged in the instant fraud. It is also true that his friend who encouraged him to participate in the fraud convinced him that it would be victimless – that anyone the conspiracy tricked into providing

money would be reimbursed by their bank or credit card company.  While Mr. Vitols knew that he was doing something illegal, he did not fully understand how his actions would harm actual people and their hard-earned money.  Mr. Vitols feels very badly about taking the hard-earned money of innocent victims who, in the end, were not rendered whole by insurers, banks and credit card companies.

Mr. Vitols knows about the value of hard-earned money.  He has worked his whole life, when he could find gainful employment.  He dropped out of high school in order to work to help support his mother and sister.  See Presentence Investigation Report dated December 4, 2019 ("PSR"), ¶ 153.  From that point until he traveled to the United States in February of 2018, Mr. Vitols worked at jobs both in Latvia and abroad (when he could not find work in Latvia).  During many periods of his life, Mr. Vitols worked multiple jobs at the same time in order to make as much money as possible to support himself and his mother and sister.  Again, Mr. Vitols feels profoundly remorseful that his actions caused substantial loss to persons who, like himself, worked hard to earn the money that they lost to the fraudulent scheme in which he participated.

Mr. Vitols now realizes that easy money in the United States comes with a heavy price: by his unlawful actions, Mr. Vitols has foreclosed the United States as a land of future opportunity should Latvia prove to be a dead end financially, as it is likely to be.  In a very real sense, the permanent exile from the United States is the most serious consequence of his illegal conduct.  Add to that, there is the suffering of having spent more than a year and a half behind bars without any visits from his family who do not have the resources to travel to see him from Latvia.[1]  Further, Mr. Vitols was at the Metropolitan Detention Center ("MDC") during the

---

[1] Mr. Vitols was remanded into federal custody from state detention commencing on or around October 31, 2018.  Prior to that time, Mr. Vitols was in state custody commencing on or around May 27, 2018.  While the Bureau of Prison should give Mr. Vitols credit for the time that he

power outage and suffered immensely during that time, as did his fellow prisoners. Finally, Mr. Vitols has brought embarrassment and shame to his family and himself for his actions. All the members of his family are law-abiding with respectable trades and professions; Mr. Vitols is sensitive to the fact that he has strayed far from their exemplary lives and the exemplary life he led before he became involved in the instant fraud scheme.

On behalf of Mr. Vitols, defense counsel respectfully requests a prison sentence of 18 months, a length of time that is in line with similarly situated codefendants, that will allow him to return to his family and home country as quickly as possible. Once home, he will be welcomed and supported by a family that continues to support him, in spite of his misconduct, and will ensure that he returns to a law-abiding life in his home country.

**I.    Background**

    **A.    Karlis Vitols's Personal History**

Karlis Vitols is 31 years old. He was born in Smiltene, Latvia on August 22, 1988. See PSR, ¶ 143. He is the older of two children raised by parents who are now divorced. See id.

Mr. Vitols grew up in a stable household of modest means. His father was and remains an electrician and his mother is a paramedic. See id. The modesty of the household in which Mr. Vitols was raised is underscored by the fact that he viewed it as necessary to drop out of secondary school in order to begin his working life, which has been continuous since that age. For the most part, Mr. Vitols has worked in the trades – mostly, in construction. See PSR, ¶¶ 154-156. For a few years, Mr. Vitols worked as a forester in Scotland. See PSR, ¶ 157. Given the scant opportunities for work in Latvia, Mr. Vitols has always had to look abroad for work

---

served in prison for the related state charge it is certainly possible he will not be given credit for that time. The very real possibility that he may not get credit for that prior prison time is an independent basis for the Court to sentence him to 18 months, which is below the stipulated sentencing guidelines range.

opportunities.  See Letter of Darta Vitola dated November 30, 2019 annexed hereto as Exhibit A. As his sister makes clear, Mr. Vitols has worked hard not just for his own sake but for the sake of his mother and sister who are more than willing to return that favor in his current hour of need.

We would also draw the Court's attention to the anecdote that Ms. Vitols provides in her letter of support on behalf of her brother: she describes a time that he noticed a family with a young child stranded by their broken-down car in the middle of winter in Latvia when he and his sister were driving by.  It was Mr. Vitols who encouraged his sister to pull over so he could lend assistance to the family.  He was able to fix the car and the family with the young child were saved from a perilous situation.  It is this gesture by which we would ask the Court to judge Mr. Vitols's true nature, as opposed to his criminal conduct here, which was hurtful, wrong but in the end an aberrant episode in his otherwise commendable life.

Mr. Vitols has also been a model prisoner at MDC, in spite of the multiple opportunities to get into trouble and the intense supervision of corrections officers who are quick to give tickets to inmates in order to keep control over the population.  Mr. Vitols has never even been accused of an infraction while at the MDC.  In addition, he has taken whatever courses were available there in order to spend his time constructively.  See Exhibit B annexed hereto.  He volunteers for Suicide Watch (the first client we have had that has volunteered for this challenging work).  See Exhibit C annexed hereto.  Finally, he works in Food Service and the evaluations he receives for that work are superlative.  See, e.g., Exhibit D annexed hereto.

**B.     The Offense Conduct and the Plea Agreement**

On September 12, 2019, Mr. Vitols pled guilty to Count One in a two-count indictment. See PSR, ¶¶ 1, 3 & 5.  The count to which Mr. Vitols pled was conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343.  See PSR, ¶ 5.  According to the terms of the plea agreement,

Mr. Vitols pled to a loss amount between $250,000 and less than $550,000 with two different two-level enhancements: the first for engaging in conduct that involved 10 or more victims; and the second for engaging in a fraud scheme that was committed outside the United States. See PSR, ¶ 6. After adjustments downwards for his timely acceptance of responsibility for his offense conduct, Mr. Vitols's agreed-upon adjusted offense level was 20. See id. Since the instant case involved Mr. Vitols's first and only brush with the criminal justice system, his Criminal History Category is I. In light of the foregoing, an offense level of 20 and a Criminal History Category of I, Mr. Vitols's advisory sentencing guidelines range was calculated to be 33 to 41 months of imprisonment. Id.

**II.    ARGUMENT**

    **A.    The Applicable Legal Standard**

As the Court is well aware, the Sentencing Guidelines are advisory and while they serve as the starting point for a sentencing court's analysis, the inquiry does not end there. As noted in Nelson v. United States, 129 S. Ct. 890 (2009), where the Court summarily reversed the Fourth Circuit which had upheld a district court's application of a presumption of reasonableness to the guidelines:

> [t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Id*. at 892. (Emphasis in original.) Thus, the guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

When imposing sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)[2] in order to create an "individualized assessment" based on a defendant's

---

[2] The relevant factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed" to, inter alia: provide

particular circumstances. Gall vs. United States, 552 U.S. 38, 49-50 (2007); see also United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." Cavera, 550 F.3d at 188.

The Court has ample discretion to impose a below-Guidelines sentence. See Kimbrough v. United States, 552 U.S. 85, 101-10 (2007). In doing so, the Court may consider, and rely upon, any information available concerning the background, character, or conduct of the defendant. See Cavera, 550 F.3d at 189-91; see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Moreover, in making an "individualized assessment," the Court is not only empowered to impose a sentence below the Guidelines range, it is required to do so where a lower sentence would be sufficient to comply with the purposes of Section 3553(a). See, e.g., United States v. Dorvee, 616 F.3d 174, 183-84 (2d Cir. 2010); United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006). This is consistent with the long-standing principle that a Court consider "every convicted person as an individual" and to uphold "the principle that the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011). In sum, the overarching task of a sentencing court is to fashion a sentence that is

---

just punishment, deter criminal conduct, protect the public from any future crimes by the defendant, and provide the defendant with rehabilitative training and treatment; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established" for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

appropriate for the individual circumstances of the offense and the defendant, and is "sufficient, but not greater than necessary" to achieve the statutory goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a).

### III. An Eighteen Month Sentence is Appropriate

Analysis of the Section 3553 factors weighs in favor of an 18-month sentence for Mr. Vitols. It is respectfully submitted that such "a sentence is sufficient but not greater than necessary" to provide just punishment.

#### A. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The sentence that we urge the Court to impose – a sentence of 18 months of imprisonment – would not undermine factors that the Court must consider, such as the seriousness of the offense, promoting respect for the law and providing just punishment, as the Court has already imposed a sentence of this approximate length to co-defendants whose conduct is substantially similar to that of Mr. Vitols.

In the table below, the Court can see for itself that the sentence that defense counsel seeks is within the range provided to other codefendants who pled to similar offense conduct, roles and loss amounts.

| Codefendant | Plea's Stipulated Sentencing Guidelines Range | Other Considerations Brought Forward By the Government | Sentence Imposed |
|---|---|---|---|
| Kirill Dedusev | 27-33 months | 1. Worked legally before engaging in fraud 2. Provided an account of his offense conduct after his arrest | 18 months |
| Mikheil Inadze | 15-21 months | 1. Only three identifiable victims 2. Lived legally in the U.S. for a decade before engaging in fraud | 12 months |

| Codefendant | Plea's Stipulated Sentencing Guidelines Range (primarily driven by loss amount) | Other Considerations Brought Forward By the Government In Its Submissions to the Court | Sentence Imposed |
|---|---|---|---|
| Igor Kalinitchev | 27-33 months | 1. Defendant was not fully aware of the illegality of the fraud | 1 day of prison (time served) |
| Stanislav Lisitskiy | 27-33 months | 1. Came to the U.S. to engage in this fraud | 18 months |
| Aleksei Livadnyi | 27-33 months | 1. Engaged in fraud soon after arriving in U.S. 2. Applied for asylum status allegedly under false pretenses | 27 months |
| Durra Mehdiyeva | 27-33 months | 1. Engaged in fraud a year after arriving via a tourist visa 2. Tried to leave the US before arrest | 18 months |
| Ielyzaveta Nazina | 27-33 months | 1. One of the more prolific participants in terms of loss and engaged in international money laundering | 18 months |
| Matiss Puke | 21-27 months | 1. Came to the US to engage in the fraud 2. Continued fraud after he knew participants were arrested | 18 months |
| Kerevan Sepiashvili | 27-33 months | 1. Did not come to the US to participate in the fraud 2. Recruited under false pretenses | 13 months |
| Melvut Yazici | 27-33 months | 1. Continued participation in the fraud even after banks started closing accounts associated with the fraud | 22 months |
| Miraga Gulijev | 27-33 months | No material defendant-specific allegations brought forward in the submission | 18 months |

In reviewing the sentencings of Mr. Vitols's codefendants, it is clear that in all but one instance the Court imposed a sentence below the stipulated sentencing guidelines range provided

8

for in the plea agreement. With respect to those codefendants who stipulated to a sentencing guidelines range of 27-33 months, the Court imposed a sentence that was on average 19 months (putting aside the sentence of 1 day for Igor Kalinitchev, which involved unusual circumstances as per the government's submission).

We understand that Mr. Vitols stipulated to a sentencing guidelines range that was higher than 27-33 months, i.e., 33-41 months. His sentencing guidelines range was higher than most of his codefendants because the loss amount attributed to him exceeded $250,000 by approximately $1350. A fair characterization of his role and the loss amount associated with his conduct are that they are similar to that of most of his codefendants who stipulated to a sentencing guidelines range of 27-33 months. Should the Court accept this characterization, then the sentence we seek on behalf of Mr. Vitols, 18 months, is well within the range of the kinds of sentences this Court imposed on similarly situated codefendants.

  **B.** **The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public From Further Crimes of the Defendant**

In light of the fact that Mr. Vitols will be deported soon after his sentencing, the Court need not linger over the issue of specific deterrence, i.e., protecting the public from further misconduct by Mr. Vitols. Soon after his sentencing, Mr. Vitols will be deported to Latvia and once there he will never able to return. As for general deterrence, the sentence that Mr. Vitols seeks is in line with that imposed on similarly situated codefendants; therefore, the Court may view 18 months as sending the appropriate signal to deter the criminal conduct at issue here.

  **C.** **The Need to Avoid Unwarranted Sentencing Disparities**

Title 18 U.S.C. § 3553(a)(6) describes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As the table above and the discussion related to it indicate, the sentence that Mr.

Vitols seeks is well within the range of the sentences that this Court has already imposed on codefendants who engaged in similar conduct. Therefore, should the Court impose a sentence of 18 months on Mr. Vitols there would be no concern regarding unwarranted disparities between codefendants.

### IV. Conclusion

For all the foregoing reasons, Karlis Vitols respectfully requests that the Court impose a sentence of 18 months with whatever terms of supervised release that it may deem necessary and appropriate. We thank the Court for its consideration of Mr. Vitols's circumstances and those of his codefendants.

Dated: December 31, 2019
      New York, New York

                                   CARDI & EDGAR, LLP

                                          /s/
                                _____
                                Dawn M. Cardi
                                99 MADISON Avenue, 8th Floor
                                New York, New York 10016
                                212.481.7770 (tel.)
                                212.271.0665 (fax)
                                dcardi@cardiedgarlaw.com

                                *Attorneys for defendant Karlis Vitols*